**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| IN RE ALLERGAN PLC SECURITIES LITIGATION | No. 18 Civ. 12089 (CM)(GWG) |

### DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

McMahon, C.J.:

This is the second motion for class certification in this putative class action, in which plaintiffs accuse Allergan PLC and associated individual defendants (collectively "Allergan") of securities fraud for allegedly failing to disclose information about a potential link between the company's textured silicone-gel breast implants and a rare form of cancer. The Court previously denied a motion for certification filed by the former lead plaintiff, Boston Retirement System, on the ground that the lead plaintiff would be unable to adequately represent the interests of the class. *See In re Allergan PLC Secs. Litig.*, No. 18-cv-12089 (CM)(GWG), 2020 WL 5796763, at *9 (S.D.N.Y. Sept. 29, 2020) ("*Allergan II*"). However, I observed in that opinion that, "There is absolutely no question that this action should proceed as a class action. It is a garden-variety securities fraud suit, a type of action particularly well suited to class treatment." *Id.* at *1. This observation remains true; and as the inadequacy issues do not exist for the replacement lead plaintiff, the motion to certify the class is GRANTED.

1

## I.    Background

The newly appointed lead plaintiff, DeKalb County Pension Fund, seeks to certify a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) consisting of:

> All individuals and entities that purchased or otherwise acquired Allergan preferred stock or common stock between January 30, 2017 and December 19, 2018, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are the Defendants; the officers, directors, and affiliates of Allergan, at all relevant times; Allergan's employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or acquired Allergan common stock through any such plan(s); any entity in which Defendants have or had controlling interest; immediate family members of any excluded person; and the legal representatives, heirs, successors, or assigns of any excluded person or entity.

Unless otherwise noted, the following allegations in support of class certification are adopted from the Consolidated Amended Complaint ("CAC"), originally filed by the former lead plaintiff, which DeKalb has now adopted. (Dkt. No. 58). The allegations are accepted as true for purposes of this motion. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 86 n.5 (2d Cir. 2017). The Court assumes the parties' familiarity with the facts and recounts only the facts relevant to this decision. A more extensive discussion about the background of this case is available in the Court's opinion and order addressing Allergan's motion to dismiss. *See In re Allergan PLC Secs. Litig.*, No. 18-cv-12089 (CM)(GWG), 2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019) ("*Allergan I*").

### A.  Allergan's Textured Breast Implants & ALCL

Allergan is a global pharmaceutical and medical products company that manufactures and sells, among other things, textured breast implants for use in breast-augmentation and breast-reconstruction procedures. During the class period, Allergan employed approximately 17,000 people and had two classes of publicly traded equity securities – common stock and preferred stock. Two of Allergan's breast implant product lines – the "Natrelle 410" and "Biocell" – are the subject of this lawsuit. (CAC ¶¶ 2, 7).

Anaplastic large cell lymphoma ("ALCL") is a rare form of non-Hodgkin lymphoma. In 1997, doctors first began associating the disease with women who have had breast implants, particularly in the scar tissue surrounding the implant. (CAC ¶¶ 3, 11). Since then, DeKalb claims that there has been a parade of medical studies and regulatory alerts examining Breast-Implant Associated ALCL ("BIA-ALCL"), including several linking the disease specifically to breast implants with a textured outer shell, such as those offered by Allergan. (CAC ¶¶ 63–117). For example, in 2011, the Food and Drug Administration ("FDA") issued a report detailing the agency's belief that "there is a possible association between breast implants and ALCL," and that "ALCL has been found more frequently in association with breast implants having a textured outer shell rather than a smooth outer shell." (CAC ¶ 66).

Beginning in 2015, scientists began linking BIA-ALCL to Allergan products. In a report published in March 2015, doctors identified 173 cases of BIA-ALCL, 97 of which (or 56%) affected women who had Allergan's Biocell textured implants – by far the largest percentage associated with one manufacturer. (CAC ¶ 75). Studies describing the apparent link between textured breast implants and BIA-ALCL continued, with some indicating that Allergan's implants were more closely associated with the incidence of BIA-ALCL than any other manufacturer. For example:

- In April 2017, two doctors from the MD Anderson Cancer Center published an article reviewing the data on BIA-ALCL from three sources: (1) MD Anderson's ALCL tracking data; (2) The University of Southern California's ALCL tracking data; and (3) the FDA's Manufacturer and User Facility Device Experience – which is a database that houses medical device incident reports submitted to the FDA. Out of the MD Anderson data, 76 cases (or 41.8%) of BIA-ALCL were associated with Allergan implants. Out of the USC data, 97 cases (or 56%) were associated with Allergan implants. And out of the FDA data, 184 cases (or 80.3%) were associated with Allergan implants. (CAC ¶ 91).[1]

---

[1] Of course, the results of this study did not necessarily indicate that Allergan's implants were more dangerous than other types of implants. The higher percentage of cases associated with Allergan could have occurred because Allergan's textured implants were the most common type of textured implant on the market. However, Allergan's

- In October 2017, another team of researchers analyzed all cases of BIA-ALCL in Australia and New Zealand from 2007 to 2016 and found that Allergan's Biocell textured implants accounted for 58.7% of the implants used (75 total) in patients who had developed the disease. The risk of developing BIA-ALCL was 14.11 times higher for Biocell as compared to a leading competitor's textured implants. (CAC ¶¶ 100–101).

- On January 4, 2018, a group of Dutch researchers found that, between 1990 to 2016, there were twenty-three known cases of BIA-ALCL in the Netherlands, twenty-two of which involved Allergan implants. (CAC ¶ 103).

The CAC discusses other such reports as well; this is simply a sampling.

### B.  Allergan's Allegedly Misleading Statements and Omissions

DeKalb argues that Allergan was well aware of the studies that showed a higher incidence of BIA-ALCL in patients with Allergan's textured breast implants, but nonetheless decided to downplay the strength of the link between its products and cancer. (CAC ¶ 78). This took the form of both misstatements and omissions of information concerning the relative risk of developing BIA-ALCL associated with Allergan's textured implants as compared to the implants of other manufacturers, as well as a possible recall based on that link.

DeKalb alleges that at least four statements made during the class period beginning January 30, 2017, downplayed the risk of recall and gave investors a false impression that Allergan's implants were no more linked with ALCL than the implants of other manufacturers.

The first is a response that Mark Marmur, a vice president in Allergan's International Communications and Press Relations division (and an individual defendant in this case), submitted in response to a January 30, 2017 *ABC News* article that had questioned why Allergan decided to cancel a post-FDA-approval study of their textured implants. In a written submission, Marmur stated that "BIA-ALCL has been reported in patients with textured breast implants *from all*

market share is not something that either party discusses, and in any event, is an issue better suited for summary judgment.

*manufacturers*," and that "Allergan is actively working to help . . . understand the association of BIA-ALCL and textured implants and educate the community." (CAC ¶¶ 84, 126 (emphasis added)). DeKalb argues that Marmur's statement downplayed the link between Allergan's implants specifically and ALCL. (CAC ¶ 127).

The second and third alleged misstatements are Allergan's SEC filings – its 2016 and 2017 10-Ks. DeKalb claims that Allergan's 2016 10-K, submitted on February 24, 2017, downplayed the association between BIA-ALCL and Allergan products. The filing stated that there have been "reports that have suggested a possible association between anaplastic large cell lymphoma and breast implants, as well as negative reports from regulatory authorities in Europe related to a breast implant manufacturer *that is not affiliated with the Company*." (CAC ¶ 134 (emphasis added)). DeKalb claims that Allergan knew this was not true at the time it made the 2016 filing, and further alleges that Allergan knew it was not true when the company included the exact same statement in its 2017 10-K, filed on February 26, 2018. (CAC ¶ 152).

The fourth alleged misstatement is a press release Allergan released on May 29, 2018 entitled, "Allergan Responds to Media Reports on Breast Implant Associated Anaplastic Cell Lymphoma (BIA-ALCL)," in which the company stated: "To date, we are not aware of any BIA-ALCL cases that have been found with other Allergan implants in Australia and New Zealand that do not include Biocell," that: "The safety profile of Allergan's smooth and textured breast implants is supported by extensive pre-clinical device testing, more than a decade of U.S. and European clinical experience," and that: "Direct causality has not been established with implants from a specific manufacturer." (CAC ¶ 159).

DeKalb argues that these statements failed to take into account more recent studies (from 2016 and 2017) that had suggested a strong link between ALCL and Allergan products,

specifically, and thus gave the false impression that Allergan's products were no less safe than those of other manufacturers. (CAC ¶ 161).

DeKalb alleges that these statements (1) gave the impression that Allergan's textured breast implants were no more closely associated with ALCL than were implants made by other manufacturers, and (2) downplayed the risk that Allergan's products could be recalled because of a possible link to BIA-ALCL.

### C. The Recall (The Corrective Disclosure)

On December 14, 2018, "GMED" – a European regulatory body responsible for assessing and certifying the conformity of medical devices to European standards – opted not to re-certify Allergan's textured breast implant portfolio, which was set to expire. This meant that Allergan's textured implants could no longer carry the important "CE" mark that connotes conformity with European health and safety standards. *See Allergan I*, 2019 WL 4686445, at *8.

Four days later, on December 18, 2018, France's National Agency for the Safety of Medicines & Health Products ("ANSM") ordered a recall of textured breast implants manufactured by Allergan from the European market, announcing that the implants "have been linked to a rare form of cancer," referring to ALCL.  (CAC ¶ 164).

The following day (December 19), Allergan released a statement stating that it had voluntarily "suspended sales of textured breast implants and tissue expanders and [was] withdrawing any remaining supply in European markets." (CAC ¶ 165). DeKalb alleges that this disclosure was the first time that Allergan acknowledged that its prior statements telling investors that its implants were not reportedly link to ALCL in Europe were inaccurate. (CAC ¶ 166).

Allergan's common stock price fell $10.20, or nearly 7%, to close at $136.56 on December 19, 2018. (CAC ¶ 167). DeKalb argues that Allergan's continual misstatements downplaying the risk of recall and the higher incidence rate of ALCL associated with Allergan products led to this

sudden drop in stock price, causing damages to the putative class of investors and violating Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5.

### D.  Relevant Procedural Background

This case was filed on December 20, 2018.

On March 21, 2019, the Court appointed Boston Retirement Services ("BRS") to serve as lead plaintiff. (Dkt. No. 49). The Court imposed one condition on the appointment of BRS as lead plaintiff: that is be represented by just one law firm, not by two. The Court ordered BRS to select between Pomerantz LLP and the Thornton Law Firm (Dkt. No. 49 at 5); the following day, BRS submitted a letter designating Pomerantz as lead counsel. (Dkt. No. 50).

Pomerantz filed the CAC – the operative complaint in this action – on April 19, 2019, alleging two counts against Allergan and seven individual defendants affiliated with Allergan: (1) violation of Section 10(b) of the Exchange Act and the corresponding SEC Rule 10b-5 against all defendants; and (2) violations of Section 20(a) of the Exchange Act against the individual defendants. (Dkt. No. 58).

On September 20, 2019, this Court granted in part and denied in part Defendants' motion to dismiss. (Dkt. No. 81). There is one surviving allegation – that Allergan's statements in the lead up to the ANSM recall "gave investors a false impression that Allergan's implants were no more linked with BIA-ALCL than other implants" manufactured by other companies. *Allergan I*, 2019 WL 4686445, at *25.

On January 31, 2020, BRS moved to certify the class. However, through the filings on the motion, the Court learned that not only had Thornton remained involved in the litigation (under the guise of "additional counsel"), but that it had effectively played the role of co-lead counsel with Pomerantz – to the point that BRS's designated class representative testified that Thornton had been fully involved in every aspect of the case. *See Allergan II*, 2020 WL 5796763, at *6.

Concluding that my order had been disregarded, I determined that BRS could not "fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4), because "Either BRS did not really acquiesce in my directive, or it is incapable of controlling its lawyers when they prove unwilling to abide by rulings of the court concerning who could serve as lead counsel." *Id*. at \*9. For that reason and that reason alone, the Court denied the first motion for class certification. *Ibid*.

On December 7, 2020, the Court appointed DeKalb as the new lead plaintiff and its counsel, Faruqi & Faruqi, LLP as lead counsel. (Dkt. No. 193).

DeKalb filed the pending motion for class certification on February 22, 2021. (Dkt. No. 202). The motion is granted.

## II.     Discussion

### A.  Legal Standard

A motion for class certification is governed by the requirements of Federal Rule of Civil Procedure 23, which provides that certification is appropriate only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Commonly expressed, these are the requirements of numerosity, commonality, typicality, and adequacy of representation. *See, e.g., In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp.3d 430, 460 (S.D.N.Y. 2018). The absence of any one of these four factors renders the class uncertifiable. *See Sykes v. Mel S. Harris and Assocs. LLC*, 780 F.3d 70, 80 (2d Cir. 2015). As the Supreme Court has observed, "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," and "effectively 'limit the class claims to those fairly encompassed by the named plaintiff's claims.' " *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349 (2011) (citation omitted).

In addition to the four factors expressly outlined in 23(a), the Second Circuit also requires that the proposed class be ascertainable – that "it is defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Secs.*, 862 F.3d 250, 257 (2d Cir. 2017). Ascertainability is a "modest threshold" and "will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id*. at 269.

But satisfying all four Rule 23(a) prerequisites and the ascertainability requirement does not end the analysis. Plaintiffs must also establish at least one of the three requirements listed under Rule 23(b). Because DeKalb moves for certification under Rule 23(b)(3), it must demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Ultimately, "the Second Circuit's general preference is for granting rather than denying class certification," meaning that the requirements of Rule 23 must be construed liberally. *Espinoza v. 953 Assocs. LLC*, 280 F.R.D. 113, 124 (S.D.N.Y. 2011) (quoting *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 361 (E.D.N.Y. 2009), *aff'd*, 568 F. App'x 78 (2d Cir. 2014)). Nevertheless, "Rule 23 does not set forth a mere pleading standard," because – unlike other pleading standards – determining whether a class should be certified requires the submission of evidence: "A party seeking class certification must affirmatively demonstrate . . .  that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart,* 564 U.S. at 350– 51. The party seeking certification bears the burden of showing that Rule 23's requirements are satisfied by at least a preponderance of the evidence.  *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013).

In response to DeKalb's motion, Allergan disputes only one factor that must be considered in undertaking class certification analysis – the predominance element under Rule 23(b)(3). Accordingly, the Court's discussion of the other factors will be brief.

### B. Rule 23(a)

1. <u>Numerosity</u>

Rule 23(a)(1) requires that the proposed class be "so numerous that joinder of all members is impracticable." Although "the numerosity inquiry is not strictly mathematical but must take into account the context of the particular case," it "is presumed for classes larger than forty members." *Pa. Public Sch. Emp's Ret. Sys. v. Morgan Stanley & Co., Inc*., 772 F.3d 111, 120 (2d Cir. 2014). "In securities fraud class actions relating to publicly owned and nationally listed corporations, the numerosity requirement may be satisfied by a showing that a large number of shares were outstanding and traded during the relevant period." *Pearlstein v. BlackBerry Ltd.*, No. 13-cv-7060 (CM), 2021 WL 253453, at *7 (S.D.N.Y. Jan. 26, 2021) (citation omitted).

Allergan is a publicly traded company with its common stock and preferred stock listed on the New York Stock Exchange ("NYSE"). Throughout the class period, the total number of Allergan common shares issued and outstanding ranged from approximately 327.6 million to 345.7 million shares, with an average weekly trading volume of approximately 13 million shares. (Expert Report of Zachary Nye, Ph.D. ("Nye Rpt.") ¶ 24, Dkt. No. 200 Ex. A)  The total number of Allergan preferred shares issued and outstanding was 5.06 million shares, with an average weekly trading volume of approximately 196,000 shares. (Nye Rpt. ¶ 25). Given the trading volume, there is no question that the size of the proposed class is so numerous that joinder of all possible plaintiffs is impracticable. The numerosity requirement is met.

2. <u>Commonality</u>

Rule 23(a)(2) requires that a case involve "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). In securities actions, the commonality requirement is satisfied, "Where plaintiffs allege that class members have been injured by similar material misrepresentations and omissions." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014).

DeKalb alleges that the members of the proposed class have suffered similar injury due to a series of similar misrepresentations and omissions by Allergan. Further, the CAC includes several common questions of law or fact that survived Allergan's motion to dismiss – for example, whether Allergan disseminated statements that misrepresented or omitted material facts relating to incidence rates of BIA-ALCL and its association with Allergan products, whether it acted knowingly in making these statements or omissions, and whether the market price of Allergan securities was affected because of these actions. (*See* CAC ¶¶ 126, 134, 152, 159). Notably, Allergan does not dispute that there are questions of law or fact common to the putative class. Plaintiffs have thus met the commonality requirement.

3. Typicality

The typicality requirement of Rule 23(a)(3) is satisfied if "each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Flag Telecom Holdings, Ltd. Secs. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) (quoting *Robidoux v. Celani*, 987 F. 2d 931, 936 (2d Cir. 1993)). "In a securities class action, when 'plaintiffs will necessarily seek to develop facts relating to . . . the dissemination of allegedly false or misleading statements underlying their claims,' the claims and nature of evidence 'are generally considered sufficient to satisfy the typicality requirement.'" *In re Bank of Am. Corp. Secs., Derivative, & Employee Ret. Income Secs. Act (ERISA) Litig.*, 281 F.R.D. 134, 139

11

(S.D.N.Y. 2012) (quoting *In re Vivendi Universal, S.A. Secs. Litig.*, 242 F.R.D. 76, 85 (S.D.N.Y. 2007)).

There is no question that class members' claims all arise from the same course of conduct: Allergan's actions pertaining to the relationship between its textured implants and ALCL. These actions – and the question of whether they violated securities laws – would have affected all putative class members in the same way insofar as we are dealing with the price of Allergan's stock.  DeKalb's situation appears no different from any other class member – it claims that it acquired Allergan securities at allegedly inflated prices due to Allergan's misstatements and/or omissions, and that it suffered monetary damages because of that alleged fraud. Clearly, all class members will seek to offer the same evidence to establish Allergan's liability. There is no indication that DeKalb's allegations differ from any other plaintiff's allegations such that it would be "subject to unique defenses which threaten to become the focus of the litigation." *In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 87 (S.D.N.Y. 2017) (citation omitted). The typicality requirement is satisfied.

### 4. Adequacy of Representation

Unlike BRS's motion for class certification, which was denied because it was an inadequate class representative, DeKalb satisfies this requirement. Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In evaluating whether a proposed class representative has met this requirement, a court considers "whether: (1) plaintiff's interests are antagonistic to those of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625–26 (1997). This requirement is designed to weed out potential lead plaintiffs

with "fundamental" conflicts of interest that "go to the very heart of the litigation." *Charron v. Wiener*, 731 F.3d 241, 250 (2d Cir. 2013) (citation omitted).

DeKalb is an institutional investor that had a sizeable investment in Allergan securities during the class period. In the Court's first decision to appoint a lead plaintiff, DeKalb was a "narrow loser" and there is no reason to think that its position with respect to Allergan has altered significantly since then. *In re Allergan PLC Secs. Litig.*, No. 18-cv-12089 (CM)(GWG), 2020 WL 8620082, at *1 (S.D.N.Y. Dec. 7, 2020). Allergan does not claim that there are any conflicts of interest between DeKalb and any other class member, and there are none of which the Court is aware. Moreover, this is not an instance in which DeKalb seeks a fundamentally different form of relief than other class members or stands to benefit from a unique resolution of the case. The adequacy of representation requirement is satisfied.

### C. Ascertainability

To be ascertainable, a proposed class "must be readily identifiable, such that the court can determine who is in the class and, thus, bound by the ruling." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 407 (S.D.N.Y. 2015) (quoting *Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010)). The requirement does not mandate that every single class member be identified when the motion for certification is made, only that the boundaries of the class be "readily identifiable." *Petrobras*, 862 F.3d at 266. Ascertainability "requires only that a class be defined using objective criteria that establish membership with definite boundaries." *Id.* at 264. The requirement is not a difficult one to meet and is only meant to dissuade certification of classes that are "truly indeterminable." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015) (citation omitted).

The class here is ascertainable. Determining who is a putative class member is easily accomplished through reference to investor records during the class period, which are readily

available and can be searched. There is no contention from Allergan that the class is not ascertainable. This requirement is met.

### D. Rule 23(b)

DeKalb seeks certification under Rule 23(b)(3), which requires "that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods" of adjudicating the controversy. Fed. R. Civ. P. 23(b)(3). Commonly expressed, these are the requirements of predominance and superiority, and both must be satisfied for the class to be certified. *See, e.g., Sykes* 780 F.3d at 82 (referring to the Rule 23(b)(3) analysis as a "disjunctive inquiry").

### 1. Predominance

The main dispute between the parties is over predominance.

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Waggoner*, 875 F.3d at 83 (quoting *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015)). The inquiry is primarily concerned with the type of evidence that will need to be offered to establish liability. A common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof," while an individualized question is one where class members "will need to present evidence that varies from member to member." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 W. Rubenstein, Newberg on Class Actions § 4:50, pp. 196–197 (5th ed. 2012)). In other words, if *most* class members will need to present different evidence to satisfy the elements of their claim, individualized questions will predominate over common ones.

Although the predominance requirement is similar to the commonality requirement of Rule 23(a), it is "far more demanding," *Amchem*, 521 U.S. at 623–24, "and is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *Petrobras*, 862 F.3d at 270. Instead, predominance "asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods*, 577 U.S. at 453 (citations omitted); *Amchem*, 521 U.S. at 623–24.

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809–10 (2011) ("*Halliburton I*"). Under Section 10(b), plaintiffs must prove: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Sci.–Atlanta*, 552 U.S. 148, 157 (2008).

As with other securities cases, the parties primarily dispute whether the element of reliance, or whether potential plaintiffs actually relied on Allergan's statements or omissions to their detriment by buying Allergan stock at inflated prices or otherwise not selling when they otherwise would have. *See, e.g., Halliburton I*, 563 U.S. at 810. Allergan also contests the element of whether there is any way to measure the economic loss associated with the alleged misrepresentations, and whether there are individualized questions over Plaintiffs' knowledge of the alleged fraud. Since there is no dispute as to the rest of the elements of the predominance inquiry the Court will only address the ones that the parties contest.

    *a.* <u>*Reliance*</u>

*i.* DeKalb is entitled to the *Basic* presumption of reliance

DeKalb does not offer direct evidence of reliance on the part of class members. This is not unusual, as the Supreme Court has recognized that requiring direct proof of reliance in securities cases "would place an unnecessarily unrealistic evidentiary burden on the Rule 10b-5 plaintiff who has traded on an impersonal market." *Basic v. Levinson*, 485 U.S. 224, 245 (1988). Accordingly, the Supreme Court has indicated that reliance can be presumed in certain circumstances, on the theory "that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* at 246. A plaintiff seeking to rely on the *Basic* presumption "must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc. v. Arkansas Teacher Retirement Sys.*, 141 S. Ct. 1951, 1958 (2021). While the Supreme Court has "held that materiality should be left to the merits stage because it does not bear on Rule 23's predominance requirement," the rest of the *Basic* prerequisites – publicity, market timing, and market efficiency – " 'must be satisfied' by plaintiffs 'before class certification.' " *Id.* at 1959 (quoting *Haliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014) ("*Haliburton II*")).

But the *Basic* presumption is rebuttable. If defendants submit "evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock," then naturally, plaintiffs could not have relied upon the alleged misstatements to their detriment. *Halliburton II*, 573 U.S. at 280. To rebut the presumption, defendants must "do more than merely produce evidence that might result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the [company's] stock's price by a preponderance of the

evidence." *Waggoner*, 875 F.3d at 101. Indeed, the Supreme Court has recently affirmed the position "that the defendant bears the burden of persuasion to prove a lack of price impact" to rebut the *Basic* presumption. *Goldman Sachs*, 141 S. Ct. at 1963.

In this litigation, Allergan takes the position that DeKalb has satisfied *Basic's* three prerequisites but insists that the presumption of reliance has been rebutted because "the alleged misrepresentations had no price impact" – i.e., that there was no relationship between any of the alleged misstatements and Allergan's share price. (Dkt. No. 206 at 8).

Allergan does not contest that the alleged misrepresentations or omissions were contained within public statements Allergan promulgated. (*See* CAC ¶¶ 125–26, 132, 148, 159). Several of the statements were made in public press releases by the company and others in publicly filed SEC documents.

Nor does Allergan dispute, for purposes of the class certification motion, that DeKalb has plausibly alleged that it bought Allergan stock during the class period at inflated prices and suffered losses when Allergan's textured implants were recalled. (*See* CAC ¶¶ 10–12). Thus, the market timing factor is also satisfied.

Finally, Allergan does not contest that the balance of factors a court looks to in connection with market efficiency – the so-called *Cammer* and *Krogman* factors, named after the cases expounding them, *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *Krogman v. Sterritt*, 202 F.R.D. 467, 474 (N.D. Tex. 2001) – favors the putative class. In fact, they weigh heavily in favor of the class.

There are five *Cammer* factors:

(1) the average weekly trading volume of the stock, (2) the number of securities analysts following and reporting on it, (3) the extent to which market makers traded in the stock, (4) the issuer's eligibility to file an SEC registration Form S–3, and (5)

the demonstration of a cause and effect relationship between unexpected, material disclosures and changes in the stock's price.

*In re Signet Jewelers Ltd. Secs. Litig.*, 16-cv-6728 (CM)(RWL), 2019 WL 3001084, at *11 (S.D.N.Y. July 10, 2019). There are three *Krogman* factors: "(1) the market capitalization of the company; (2) the bid-ask spread of the stock; and (3) the percentage of stock not held by insiders." *Ibid*.

The *Cammer* factors suggest an efficient market. Allergan stock experienced a high weekly trading volume throughout the class period – 3.9% of outstanding shares of common stock and 3.9% shares of outstanding shares of preferred stock. (Nye Rpt. ¶¶ 24–25). These figures indicate market efficiency (*Cammer* One). During the class period, at least twenty-nine analysts issued at least 1,200 reports on Allergan stock, and Allergan also filed publicly available SEC filings (*Cammer* Two). (Nye Rpt. ¶ 29 & Ex. 5, 5B, 5C). Allergan also traded on the NYSE and NASDAQ during the class period, and its common stock was held by more than 1,500 institutional investors which accounted for approximately 84% of the public float (*Cammer* Three). (Nye Rpt. ¶¶ 34–35, 41). For its preferred stock, more than 140 institutions held approximately 76% of the public float. (Nye Rpt. ¶ 42 & Ex. 9B.) Finally, Allergan was eligible for S-3 registration and filed a Form S-3 prior to and during the class period (*Cammer* Four). (Nye Rpt. ¶ 48).

The *Krogman* factors also suggest an efficient market. During the class period, Allergan's market capitalization ranged between $46.06 billion and $86.03 billion, making it larger than 94.3% of all companies traded on the NYSE and larger than 98.4% of all companies traded on the NASDAQ. (*Krogman* One). (Nye Rpt. ¶¶ 56–57). *See, e.g.*, *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018) (observing that a market capitalization of $7.35 billion was high enough to suggest market efficiency). "A large bid-ask spread is indicative of an *in*efficient market, because it suggests that the stock is too expensive to trade." *Krogman*, 202

F.R.D. at 478 (emphasis added). But during the class period, the average bid-ask spread was 0.01% for Allergan common stock and 0.19% for Allergan preferred stock.  (Nye Rpt. ¶ 43 & Ex. 10A, 10B).  These spreads are sufficiently low for the second *Krogman* factor to support a presumption of efficiency. *See Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 154 (S.D.N.Y. 2012) (average bid-ask spread of 0.198% supported finding of efficient market). And finally, during the class period, the overwhelming majority of Allergan's outstanding shares was not owned by insiders – 99.9% of Allergan's outstanding common shares and 100% of its outstanding preferred shares were owned by the public (*Krogman* Three). (Nye Rpt. ¶ 59 & Ex. 14A, 14B).

All together, these factors so strongly support a presumption of market efficiency, that it obviates the need to examine the empirical evidence necessary to evaluate the fifth *Cammer* factor. *See Signet*, 2019 WL 3001084, at *13 (noting that where the rest of the *Cammer* and *Krogman* factors "all point toward market efficiency, a court can dispose of *Cammer*'s fifth factor completely"); *see also Waggoner*, 875 F.3d at 97–98.

> *ii.* Allergan has not rebutted the *Basic* presumption of reliance

The only real dispute on predominance is whether Allergan has rebutted the *Basic* presumption. Allergan argues that there is no relationship between any of its alleged misstatements and its share price; no price impact such that the decline in Allergan's share price following the ANSM recall must have been attributable to something other than Allergan's alleged fraud. I reject this argument.

"[F]or a defendant to erase the inference that the corrective disclosure had price impact – *i.e.*, that it played some role in the price decline – it must demonstrate under the preponderance-

of-the-evidence standard, using event studies[2] or other means, that the other events explain the entire price drop." *Ark. Teacher Ret. Sys. Goldman Sachs Grp., Inc.*, 955 F.3d 254, 270 n.18 (2d Cir.) *vacated on other grounds by Goldman Sachs*, 141 S. Ct. at 1963. "[M]erely suggesting that another factor also contributed to an impact on a security's price does not establish that the fraudulent conduct complained of did not also impact the price of the security." *Waggoner*, 875 F.3d at 105. Instead, "it is Defendants' burden to show the *absence* of price impact – not merely to challenge Plaintiff on the persuasiveness of its own price impact claim – once *Basic*'s presumption of reliance attaches." *Signet*, 2019 WL 3001084, at *17. In short, a defendant must demonstrate that the materialization of the concealed risks had no impact on the price of its stock.

The absence of price impact can be shown in two ways. First, a defendant can present evidence that the alleged misrepresentations had no "front-end" impact on stock – i.e., no impact on price when the statements were made. *See, e.g., In re Chicago Bridge & Iron Company N.V. Secs. Litig.*, No. 17-cv-1580 (LGS), 2020 WL 1329354, at *3 (S.D.N.Y. Mar. 23, 2020). Second, a defendant may try to show that there was no "back-end" impact following a corrective disclosure – i.e., that the alleged misrepresentations were not associated with any negative stock returns. *Ibid.* Allergan asserts that DeKalb cannot demonstrate any front-end or back-end impact on Allergan's stock associated with the allegedly fraudulent statements. Neither argument is persuasive.

With respect to front-end impact, Allergan argues that "there was no statistically significant positive price reaction in Allergan securities on any of the dates" of the alleged misstatements. (Dkt. No. 206 at 9). In support, it cites the expert opinion of Professor Douglas J. Skinner, Ph.D, who performed a regression analysis on Allergan's stock price on six dates associated with alleged

---

[2] An event study compares the actual stock price movement on the date of a disclosure (event) to an estimate of what the return would have been absent the disclosure and is used to assess whether a disclosure had a significant effect on stock price.

misstatements (i.e., January and February 2017, May 2018, etc.)[3] and found that there was "no statistically significant abnormal returns for Allergan's common or preferred stock on the impact dates of alleged misrepresentations, i.e., none of the abnormal returns on th[ose] dates [were] statistically different from zero using a 95% confidence level." (*See* Skinner Rpt. ¶ 65 & Ex. 6). Put simply, in Professor Skinner's view, there were no abnormal price fluctuations on the dates of Allergan's alleged misrepresentations, thereby evidencing no front-end price impact.

But Professor Skinner's opinion in this regard is unpersuasive because DeKalb's case is not premised on the theory that Allergan's alleged misrepresentations directly caused any unreasonable *increase* in Allergan's stock price. Rather, DeKalb claims that Allergan's statements helped *maintain* an inflated share price, a theory known as price inflation maintenance. *See Goldman Sachs*, 141 S. Ct. at 1959. Under the theory, "statements that merely maintain inflation already extant in a company's stock price, but do not add to that inflation, nonetheless affect a company's stock price." *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 256 (2d Cir. 2016). In DeKalb's view, Allergan's failure to disclose that its textured implants were apparently associated with a higher incidence of ALCL than other manufacturers caused its stock price to be improperly inflated. Any statements that Allergan made regarding ALCL – but which did not disclose this fact – helped maintain an inflated stock price. Once a corrective disclosure was finally made – i.e., the ANSM recall – Allergan's share price fell to the range of what it should have been all along. At bottom, it does not matter one bit for the price maintenance theory whether the alleged misstatements were directly correlated with an increase in Allergan's share price, evidence of

---

[3] The dates are: January 30 and 31, 2017 – associated with Allergan's statement responding to the *ABC News* article where the company discounted any relationship between its implants and ALCL unique from other manufacturers; February 27, 2017 – associated with Allergan's filing of its 2016 10-K; February 20, 2018 – associated with Allergan's filing of its 2017 10-K; and May 29 and 30, 2018 – associated with Allergan's press release that stated the company was "not aware of any BIA-ALCL cases that have been found with other Allergan implants in Australia and New Zealand that do not include Biocell."

Allergan's fraud was apparent once the stock plummeted following the ANSM recall – the event "correcting" Allergan's previous misrepresentations.

Therefore, Professor Skinner's analysis on front-end price correlation does not disprove DeKalb's theory at all. In fact, Professor Skinner acknowledged in his deposition that it was "possible" that the lack of any statistically significant price reaction immediately following the alleged misrepresentations was explainable by the price maintenance theory. (Skinner Tr. at 242: 5–12).[4] Given that "the defendant bears the burden of persuasion to prove a lack of price impact" once the *Basic* presumption has been satisfied, Allergan's arguments against any front-end price impact are unpersuasive. *Goldman Sachs*, 141 S. Ct. at 1963.

Allergan has also failed to persuade the Court that there was no back-end price impact once the corrective disclosure about the alleged link between Allergan's textured implants and ALCL was made. Plaintiff's expert, Zachary Nye, Ph.D., reported a statistically significant abnormal return of -5.28% on December 19, 2018, the day following the ANSM recall. (Nye Rpt. Ex. 11B at 9). Allergan does not contest this fact, and readily admits that Allergan's stock price took a sharp and abnormal negative turn after the recall was announced.

But Allergan insists that this one instance does not mean that there was any reliance by the putative plaintiffs because – in its view – there were no similar price reactions to fifteen other public reports of a potential link between textured implants and ALCL. For example, Allergan points to Professor Skinner's observation that, on fifteen days on which incidence reports or news articles about the possible link between ALCL and textured implants were published ("Incidence Rate Publication"), there were no statistically significant price fluctuations of Allergan stock.

---

[4] At his deposition, Professor Skinner was asked whether he would "agree that it's possible that the lack of statistically significant price reaction to the alleged misrepresentations is explainable by the price maintenance theory?" He answered, "Yes, that's possible." (Skinner Tr. at 242: 5–12).

(Skinner Rpt. ¶¶ 70–148). These dates ranged from March 2015 through May 2018 – right before Allergan's textured implants were recalled by the ANSM, and some of these reports were included in the CAC as evidence of Allergan's knowledge of the link between textured implants and ALCL. (Skinner Rpt. Ex. 5-B).

Allergan's argument based on the Incidence Rate Publications proceeds in two steps: First, it claims that because there was no statistically significant price impact associated with the fifteen Incident Rate Publications Skinner analyzed, the market must have been indifferent to the reports of the link between textured implants and ALCL described in those publications. Second, it reasons that because the ANSM recall did not convey any new information about the incidence rates of ALCL associated with textured implants, and because the market was indifferent to the information that was already disseminated, the decline in Allergan stock price on December 19, 2018, must have been attributable to something else. In essence, Allergan is arguing is that because its share price did not fluctuate abnormally in reaction to previous news about the link between textured implants and ALCL, then the abnormal fluctuation seen on the day after the ANSM recall must be because of something other than what Allergan told investors about its products – that the cause of the price drop must have been due to some other reason not attributable to Allergan.

This is nonsense.

First, DeKalb is not alleging that any of the fifteen Incidence Rate Publications Professor Skinner analyzed was a corrective disclosure. DeKalb alleges that there was only one corrective disclosure – the ANSM recall, which was correlated with a sharp negative price drop of Allergan stock. The Incidence Rate Publications that Allergan proffer are not evidence of any corrective disclosure that the market disregarded, but rather a growing public awareness of a possible link between textured implants and ALCL that DeKalb alleges Allergan *specifically tried to downplay*

*and discredit* by making misrepresentations to the public, which culminated in a significant price decline once its textured implants were recalled. The recall announcement is the main incident to analyze; and Allergan does not dispute that the recall was associated with a significant price decline. The fifteen Incidence Rate Publications thus do not go to the specific theory of liability DeKalb advances – that Allergan knew that the risk of a *recall* would be high because its implants were more associated with ALCL than other manufacturers. In fact, none of the fifteen Incidence Rate Publications that Professor Skinner analyzed focused on the likelihood of a recall.

The presence or absence of a statistically significant price decline following any of the other dates is thus meaningless to the certification analysis. Allergan is essentially straw-manning an argument that DeKalb does not make. This alone, is sufficient to defeat Allergan's argument against any back-end price impact. There was unquestionably a price impact associated with the key corrective disclosure – the ANSM recall announcement – which is sufficient to sustain the *Basic* presumption of reliance.

But Allergan's arguments against the presumption are lacking in other ways as well. For example, DeKalb's expert argues that Professor Skinner actually misidentified the date of the first public release of at least four of the fifteen sources he analyzed for his report. (Nye Rebuttal at ¶¶ 41–43, Dkt. No. 212 Ex. 1). These errors discredit Professor Skinner's price impact analysis insofar as it was studying the wrong dates. Furthermore, Professor Skinner admitted in his deposition that he "did not formally" review any of the Incidence Rate Publications comprising his event studies for content, but merely "assume[d] that there was something potentially new or informative." (Skinner Tr. at 111:11; 112:8–14). One would generally not expect any price impact following events that did not reveal any new information, meaning that an absence of significant

price impact for some of the dates in question was unsurprising and not probative of anything. (Skinner Tr. 109:2–7).

These shortcomings call into question Professor Skinner's conclusion that the market was indifferent to information pertaining to the relative strength of the link between ALCL and Allergan textured breast implants.

Finally, numerous courts have noted that, "The failure of an event study to find price movement does not prove lack of price impact with scientific certainty." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015). While defendants do not need to prove a lack of price impact with scientific certainty, what this means is that "The absence of price movement [] in and of itself, is not sufficient to sever the link between the [] corrective disclosure and the subsequent stock price drop." *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461 (PAC), 2018 WL 3854757, at *4 (S.D.N.Y. Aug. 14, 2018) *vacated on other grounds by Arkansas Teacher Retirement Sys. v. Goldman Sachs Grp., Inc.*, —F. 4th—, 2021 WL 3776297 (2d Cir. Aug. 26, 2021). This means that even *if* there was convincing evidence of an absence of price impact associated with the corrective disclosure (which there is not), that by itself would still be insufficient to rebut the *Basic* presumption. *See ibid.*; *Signet* 2019 WL 3001084, at *16.

As Allergan has failed to prove by a preponderance of the evidence that the ANSM recall – the main corrective disclosure according to DeKalb – was *not* associated with a negative price impact, it has not succeeded in rebutting the *Basic* presumption. DeKalb is thus permitted to presume the reliance factor of the predominance inquiry on that basis, alone.

The Court thus need not address DeKalb's insistence that it would be entitled to a presumption of reliance based *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), which "allows the element of reliance to be presumed in cases involving primarily

omissions, rather than affirmative misstatements." *Waggoner*, 875 F.3d at 93. Indeed, it appears

that the *Affiliate Ute* presumption would actually not apply in this case, as that doctrine is

inapplicable where "the Plaintiffs' complaint alleges numerous affirmative misstatements by the

Defendants." *Id*. at 96. Here, DeKalb points to numerous affirmative statements that it claims was

misleading, and thus it is "not in a situation in which it is impossible for [it] to point to affirmative

misstatements." *Ibid*.

       Allergan has failed to rebut the presumption of reliance based on *Basic*, so this aspect of

the predominance inquiry is thus met.

       *b.  Economic Loss*

       The economic loss arguments in Allergan's opposition memorandum do not differ from

those in its opposition to the previous motion for class certification. Allergan argues that

certification should be denied because DeKalb has not presented a class-wide damages model

capable of disaggregating damages caused by its single theory of loss – the loss attributable to its

statements downplaying the risk of recall of Allergan's products as compared to other

manufacturers'.

       DeKalb's expert, Zachary Nye, proposes a damages model by using an event study to

isolate the company-specific price movement caused by the revelation of facts related to the

alleged fraud. Nye notes that, "The decline in a security's price in response to [a corrective

disclosure] reflects the dissipation of price inflation created by earlier misrepresentations and/or

omissions." (Nye Rpt. ¶ 66). This event study analysis proceeds by isolating the price impact of

the earlier misrepresentations. Once the price impact is isolated, "one can estimate the price

inflation due to the alleged fraud for each day during the Class Period, and on a Class-wide basis

for each member of the Class." (*Ibid*.). In short, damages for each class member attributable to

Allergan's alleged fraud can be calculated by subtracting the price inflation at the time of purchase from the price inflation at the time of sale. (Nye Rpt. ¶ 65; Nye Rebuttal ¶ 57).

Allergan insists that Nye's proposed event study method runs contrary to the rule of *Comcast v. Behrend*, 569 U.S. 27 (2013), in which the Supreme Court held that, "at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case," and that "courts must conduct a rigorous analysis to determine whether that is so." *Id*. at 35 (cleaned up). In other words, "a damages estimate proffered by a plaintiff's expert must actually correspond to the specific theory of liability that plaintiffs advance. 'If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3).' " *In re Namenda Indirect Purchaser Antitrust Litig.*, —F. Supp. 3d—, No. 15-cv-6649 (CM) (RWL), 2021 WL 509988, at *15 (S.D.N.Y. Feb. 11, 2021) (quoting *Comcast*, 569 U.S. at 35). Allergan insists that the damages model Nye offers does not correspond with its only remaining theory of liability, but would rather calculate generalized damages, which would conflate several different theories of liability (some of which were dismissed in the Court's prior order discussing Allergan's motion to dismiss).

But Allergan's damages model is consistent with its liability case.

As an initial matter, there is no indication that Nye's damages model incorporates price inflation attributable to already-dismissed theories of liability. His original expert report in support of certification was submitted on January 31, 2020, months after the Court already dismissed the questionable theories of liability from this case. (*See* Dkt. No. 200, Ex. A). Thus, Nye's proposed model is appropriately premised on DeKalb's lone remaining theory of the case.

Additionally, Nye's opinions about class-wide damages are no different from those he offered in a different case, where the Second Circuit upheld his methodology as complying with

*Comcast*. In *Waggoner v. Barclays PLC*, Nye offered an opinion on a damages model that "complie[d] with *Comcast*" because it "directly measured" the harm associated with earlier misrepresentations by observing "the drop in price" of a corrective disclosure. 875 F.3d at 106. This Court does not see any noticeable difference between Nye's event study damages model in *Waggoner* and the event study damages model that he offers in this case. And insofar as Allergan is insisting that an event study damages model is unable to isolate the price drop attributable to any specific misrepresentation or corrective disclosure, this Court has in the past "reject[ed] the suggestion that an event study is incapable of disaggregating the effects of confounding information. Were it otherwise, nearly every securities fraud class action would fail." *Signet*, 2019 WL 3001084, at *20. As this Court has previously noted, there is "no reason why an event study – the generally accepted method for measuring damages in a securities fraud class action – cannot work in this case." *Ibid*. That same principle applies, here.

There is no reason to conclude that the event study model offered in this case is flawed. Of course, DeKalb will ultimately need to disaggregate any legitimate confounding factors to *prove* economic loss, but it need not do so at this juncture to establish that common issues relating to damages predominate for purposes of class certification. *See Waggoner*, 875 F.3d at 106. Courts have long held that "Plaintiffs are not required at [the class certification] stage to demonstrate that any price impact was due to the prior misrepresentation alone." *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018); *see also Haliburton I*, 563 U.S. at 807. Rather, a plaintiff's burden at this stage is simply to propose a methodology for calculating damages that corresponds to its theory of liability. The methodology that Nye describes, which applies on a class-wide basis, is capable of measuring the out-of-pocket losses suffered by the class members.

28

Because DeKalb has provided a class-wide model for calculating damages arising from its theory of liability, it has met its burden under *Comcast*, thereby satisfying the economic loss element of the predominance inquiry.

    *c.*  *Miscellaneous Predominance Arguments*

Allergan advances two additional categories of individualized questions that it believes predominate over questions common to the class. Both are without merit.

First, Allergan argues that individualized questions predominate as to the knowledge of each putative class member of the alleged misrepresentations made by Allergan. To establish liability, "a Section 10(b) claimant 'must allege and prove' that the claimant traded 'in ignorance of the fact that the price was affected by the alleged manipulation." *In re Initial Public Offerings Secs. Litig.*, 471 F. 3d 24, 43 (2d Cir. 2006) (quoting *Gurary v. Winehouse*, 190 F.3d 37, 45 (2d Cir. 1999)). Allergan insists that, because there were many studies on the potential link between textured implants and ALCL, determining the knowledge of each individual class member as to these studies – and thus whether the class member traded "in ignorance" of price manipulation – requires individualized inquiries that predominate over common ones. I disagree.

DeKalb's argument is that class members traded in ignorance of the risk of recall of Allergan's textured implants as compared to other manufacturers – something that it alleges Allergan constantly tried to downplay in its public statements. DeKalb's allegations suggest that all plaintiffs likely had the same knowledge as to the risk of recall and were all affected by Allergan's statements downplaying the risk in a similar way. The primary question relating to Allergan's liability is not whether any individual investor was aware of the link between textured implants and ALCL generally, but whether the investor was aware of the risk posed by Allergan's products specifically. This question – the one that is the actual focus of this case – is particularly

suited for class treatment and is directly related to statements made by Allergan. Put differently, all plaintiffs will likely need to point to specific statements made by *Allergan* to demonstrate its ignorance of the true risk of negative outcomes associated with *Allergan* securities. This is evidence that is common to all class members.

*In re IPO* is also distinguishable from this case for another reason. In *IPO*, the court was faced with six focus cases that represented "310 consolidated class actions, which themselves were consolidations of thousands of separate class actions." *Id*. at 27. The cases were filed "against 55 underwriters, 310 issuers, and hundreds of individual officers of the issuing companies, alleging that the Defendants had engaged in a scheme to defraud the investing public in violation of federal securities laws." *Ibid*. In total, "There were more than 900 IPOs allegedly manipulated" by the scheme. *Id*. at 43. Such an action was not suitable for class action because, by plaintiffs' own admission, there was an "industry-wide understanding" that the alleged scheme was ongoing and some possible class members may have even been partial participants in the scheme. *Ibid*. Individualized inquiry into the knowledge of each putative class member was necessary given "Plaintiffs' own allegations as to how widespread was knowledge of the alleged scheme." *Ibid*. DeKalb's case is fundamentally different and is far less complex. DeKalb is alleging only that class members were unaware of the risk of recall of Allergan's textured implants when compared to other manufacturers. There is no reason why common questions would not predominate as to this form of knowledge.

Second, Allergan contends that DeKalb's theory requires losses to be calculated in different ways for different types of investors based on their individual level of risk tolerance. But Allergan's argument is based on a Fifth Circuit case, *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015), which is not applicable in the Second Circuit. In *Ludlow*, the court found certification

inappropriate for a subclass who had purchased BP stock *prior* to the 2010 Deepwater Horizon oil spill because plaintiffs' theory of liability for that subclass "hinge[d] on a determination that each plaintiff would not have bought BP stock *at all* were it not for the alleged misrepresentations," a question that "require[d] individualized inquiry." *Ibid*. Yet in the same opinion, the Fifth Circuit affirmed the certification of a subclass of plaintiffs who bought BP stock *after* the Deepwater Horizon spill, because the theory of damages for that subclass proceeded on a "stock price inflation" theory. *Id.* at 689.

Here, DeKalb is not proceeding on just a materialization-of-risk theory but also on a price-inflation theory. The Second Circuit has upheld class certification in similar scenarios. *See Waggoner*, 875 F.3d at 106. Importantly, DeKalb's theory of liability does not hinge on each putative plaintiff's failure to buy Allergan stock but for the alleged misrepresentations. *See, Ludlow*, 800 F.3d at 690. Instead, its theory of damages is that plaintiffs "acquired [Allergan's] securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures." (CAC ¶ 19). This is a theory that this Court has endorsed in the past as suitable for class certification. *See, e.g., Signet*, 2019 WL 3001084, at *20.

Thus, not only is *Ludlow* an out-of-circuit case that is contrary to precedent in this Circuit, but its facts are inapplicable to the facts in the case at bar. *Ludlow* actually affirmed certification of a different subclass of plaintiffs whose primary theory was that "because of BP's misstatements, the stock price was higher than it should have been" and whose "damages model, in turn, relied on a theory that the 'inflation' in the stock price caused by the misstatements would be exposed by the fall in the price when certain 'corrective events' brought the 'true' information to the market's attention." *Ludlow*, 800 F.3d at 680.

Based upon the foregoing, DeKalb has established that common questions of law and fact predominate over individualized ones in this case.

### 2. Superiority

Finally, Rule 23(b)(3)'s superiority requirement mandates that a court find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The rule provides four factors for determining whether a class action is superior:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Rule 23(b)(3)(A)-(D).

Allergan does not contest the superiority element at all. But the Court will nonetheless quickly address all four factors, as they favor certification.

The Court is not aware of any putative class member that has expressed a desire to prosecute separate actions (factor one). The Court is similarly unaware of any litigation currently ongoing involving the same class members about the regarding the same controversy (factor two). Securities class actions are often litigated in the Southern District of New York, and Allergan has not objected to this forum in any of its filings before the Court (factor three). Finally, there is nothing unmanageable about this garden-variety securities class action. Even if there were an unexpected obstacle, "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." *Petrobras*, 862 F.3d at 268 (citation omitted). Courts have long recognized that class actions are a desirable

means for resolving claims based on securities laws, and "Most violations of the federal securities laws, such as those alleged in the Complaint, inflict economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *In re Blech Secs. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999). Class actions allow litigants to avoid disparate results among those who are able to seek redress. *Id.* at 108.

With over 13 million shares of common stock trading per week (*see* Nye Rpt. ¶ 24), there is no question that there may be an exceedingly high number of individual lawsuits absent a class action. Thus, class certification is the superior method for adjudicating this case.

## CONCLUSION

DeKalb's motion to certify a class is granted in accordance with this opinion.

The Court certifies the following class:

All individuals and entities that purchased or otherwise acquired Allergan preferred stock or common stock between January 30, 2017 and December 19, 2018, inclusive (the "Class Period"), and who were damaged thereby. Excluded from the Class are the Defendants; the officers, directors, and affiliates of Allergan, at all relevant times; Allergan's employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or acquired Allergan common stock through any such plan(s); any entity in which Defendants have or had controlling interest; immediate family members of any excluded person; and the legal representatives, heirs, successors, or assigns of any excluded person or entity.

DeKalb's attorneys at Faruqi & Faruqi, LLP are appointed as class counsel.

The Clerk of Court is respectfully directed to close the motion at Dkt. No. 198.

This constitutes the written order of the Court.

September 8, 2021
New York, New York

_____
                United States District Judge

BY ECF TO ALL COUNSEL