```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
IN RE ALLERGAN PLC SECURITIES           :    OPINION AND ORDER
LITIGATION                                   18 Civ. 12089 (CM)(GWG)
                                        :
---------------------------------------------------------------X
```

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

      This securities fraud class action was brought against Allergan plc ("Allergan") and a number of individuals. Lead Plaintiff, DeKalb County Pension Fund ("DeKalb"), has filed a motion seeking to compel defendants to produce certain documents and information that were withheld on the basis of attorney-client privilege.[1] For the following reasons, DeKalb's motion is granted in part.

I. BACKGROUND

      "Allergan is a global pharmaceutical company focused on developing, manufacturing, and bringing to market a wide range of pharmaceutical and medical products." Reynolds Decl. ¶ 3. This securities class action revolves around alleged material misstatements made by defendants regarding Allergan's breast implants and a type of cancer known as Breast Implant Associated Anaplastic Large Cell Lymphoma ("BIA-ALCL"). See Decision And Order Granting In Part And Denying In Part Defendants' Motion to Dismiss, filed September 20, 2019 (Docket # 81), at 41-43, 45 (permitting plaintiffs' claims of securities fraud to go forward "to the

---

[1] Motion to Compel, filed June 18, 2021 (Docket # 239) ("Pl. Mot."); Memorandum of Law in Support, filed June 21, 2021 (Docket # 247) ("Pl. Mem."); Declaration of James M. Wilson, Jr. in Support, filed June 21, 2021 (Docket # 248) ("Wilson Decl."); Memorandum of Law in Opposition, filed July 8, 2021 (Docket # 251) ("Def. Opp."); Memorandum of Law in Opposition, filed July 9, 2021 (Docket # 252) ("Def. Sealed Opp."); Declaration of Jared Gerber in Opposition, filed July 9, 2021 (Docket # 253); Reply Memorandum of Law in Support, filed July 19, 2021 (Docket # 259); Declaration of Taylor K. Reynolds in Opposition, filed August 12, 2021 (Docket # 264) ("Reynolds Decl.").

extent Defendants' disclosures gave investors a false impression that Allergan's implants were no more linked with BIA-ALCL than other implants").

In the course of discovery, defendants have produced various versions of two separate privilege logs to DeKalb: one for documents which defendants produced to DeKalb with redactions appearing within an otherwise-produced document, see Exh. 3 of Wilson Decl. ("Privilege Redact Log"), and a second for documents which defendants withheld entirely, see Exh. 4 of Wilson Decl. ("Privilege Withhold Log").  Defendants' privilege log for redacted documents includes the Bates number for the first document in the family, the record type, a date and time for the family of documents, who the document is from or the author, who it was sent to, anyone who was included in the "cc" or "bcc" line, the attorney on the underlying legal advice, the privilege basis, the privileged subject matter and the privilege type.  See Privilege Redact Log.  For those documents which defendants withheld entirely, defendants' privilege log includes a log number, the record type, an attachment count, a date and time for the family of documents, the author or who it was from, who it was sent to, anyone who was included in the "cc" or "bcc" line, the attorney on the underlying legal advice, the privilege basis, the privileged subject matter and the privilege type.  See Privilege Withhold Log.

The instant dispute involves documents and information defendants withheld from DeKalb based on claims of attorney-client privilege.  See Pl. Mot.  While this dispute was first raised in letters from the parties, it became clear that defendants were prepared to re-review certain documents.  (See Docket # 227, 228, 233).  Accordingly, the Court denied DeKalb's request without prejudice to a new application after that re-review occurred.  Memo Endorsement, filed June 7, 2021 (Docket # 234), at *6.[2]  The Court also explained that, given

---

[2] *___ refers to pages assigned by the ECF system.

2

"that justifications for privilege normally must be accomplished through the filing of detailed affidavits, letter briefing may not be sufficient." Id.  On June 18, 2021, DeKalb filed the instant motion.[3]  See Pl. Mot.

DeKalb has grouped its objections to defendants' assertions of privilege into five categories and selected a representative sample of documents for each category.  See Wilson Decl. ¶ 25.  On July 27, 2021, the Court directed defendants to provide unredacted copies of DeKalb's representative samples in the event the Court felt it necessary to conduct an in camera review of any of the documents.  (See Docket # 261).  Defendants did so, the Court conducted an in camera review of some of the documents, and the Court held a conference on September 9, 2021, at which it made certain rulings as to documents in one and three (requiring production as to some and permitting withholding as to others).

II. GOVERNING LAW

Because the claims in this case arise under federal law, federal common law on attorney-client privilege applies.  See Fed. R. Evid. 501.  Under federal common law, "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011) (citing In re Cnty. of

---

[3] Defendants claim DeKalb's motion "reframes the privilege issues raised by Plaintiff in a way that bears little resemblance to the ones originally discussed by the parties, and further challenges additional documents on additional grounds that were never previously raised with Defendants." Def. Opp. at 1.  Defendants therefore argue DeKalb "fail[ed] to engage in good-faith meet-and-confer efforts on these issues thus provid[ing] an independent basis to deny [DeKalb's] motion." Id. at 2.  While this Court requires that the parties confer prior to bringing any discovery motion, see Individual Practices of Magistrate Judge Gabriel W. Gorenstein, dated June 17, 2021, ¶ 2.A, we have the ability to waive compliance with those Practices and it appears appropriate to do so here given the interest in not delaying this dispute further and the fact that there is no reason to believe that additional conferring would alter the parties' positions.

3

Erie, 473 F.3d 413, 419 (2d Cir. 2007)), cert. denied, 565 U.S. 992 (2011); accord United States v. Krug, 868 F.3d 82, 86 (2d Cir. 2017). "The purpose of the privilege is to encourage clients to make full disclosure to their attorneys." United States v. Ackert, 169 F.3d 136, 139 (2d Cir. 1999) (punctuation omitted). Courts have emphasized that "[w]hile the privilege confers important social benefits, it also exacts significant costs" because "[i]t runs counter to the ordinary judicial interest in the disclosure of all relevant evidence." Application of Sarrio, S.A., 119 F.3d 143, 147 (2d Cir. 1997); accord In re Bairnco Corp. Secs. Litig., 148 F.R.D. 91, 96 (S.D.N.Y. 1993) ("the attorney-client privilege both advances and impedes the administration of justice"). Accordingly, courts apply the attorney-client privilege "only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." Mejia, 655 F.3d at 132 (punctuation omitted).

"The party claiming the benefit of the attorney-client privilege has the burden of establishing all the essential elements." United States v. Adlman, 68 F.3d 1495, 1500 (2d Cir. 1995). "The party invoking the privilege also has the burden to show that the privilege has not been waived." Universal Standard Inc. v. Target Corp., 331 F.R.D. 80, 86 (S.D.N.Y. 2019).

III. DISCUSSION

DeKalb challenges defendants' claims of attorney-client privilege on various grounds and seeks to compel various categories of documents and information. See Pl. Mem. at 9-22. DeKalb submitted defendants' privilege logs indicating which entries it challenges by writing the category number next to the entry. See Privilege Redact Log; Privilege Withhold Log. We address next categories two, four and five.

    A.  Category Two

Category Two consists of entries

4

>for which (i) the "Privileged Subject Matter" column appears to address business-related matters (rather than legal matters) such as public relations communications, media statements, customer communications, or marketing press releases, and (ii) no attorney or an unidentified "in-house counsel" is in the "Underlying Legal Advice" column, and (iii) no attorney is identified in the "From / Author", "To" column, and (iv) an attorney appears to be unnecessarily copied along with numerous other non-attorney Allergan employees in the "CC / BCC" column."

Pl. Mem. at 12 (emphasis omitted).  There are 258 documents in this category.  Id.

Attorney-client "privilege protects from disclosure communications among corporate employees that reflect advice rendered by counsel to the corporation."  Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A., 160 F.R.D. 437, 442 (S.D.N.Y. 1995).  Thus, attorney-client privilege is not lost where there is "distribution within a corporation of legal advice received from its counsel," provided that disclosure is made to employees that are "in a position to act or rely on the legal advice contained in the communication."  Scott v. Chipotle Mexican Grill, Inc., 94 F. Supp. 3d 585, 598 (S.D.N.Y. 2015).  It is therefore not required that an attorney be a party to the communication that shares the legal advice from the attorney.  We also see no particular need for the attorney's name to be revealed in the communication, or for that matter the privilege log, in order for the privilege to be maintained.  Of course, the assumption behind these principles is that what is being shared is legal advice to begin with, not business advice, to which no privilege would attach.

On this question, case law recognizes that,

>[i]n light of the two hats often worn by in-house lawyers, communications between a corporation's employees and its in-house counsel though subject to the attorney-client privilege must be scrutinized carefully to determine whether the predominant purpose of the communication was to convey business advice and information or, alternatively, to obtain or provide legal advice.

In re Aenergy, S.A., 451 F. Supp. 3d 319, 323 (S.D.N.Y. 2020) (punctuation omitted).  "Clients are entitled to communicate confidentially with their business lawyers, as much as with their

5

litigation counsel, provided that the business lawyers are functioning in their capacity as lawyers, and that the advice being solicited or offered has a 'legal' character." TVT Recs., Inc. v. Island Def Jam Music Grp., a Div. of UMG Recordings, Inc., 2003 WL 749801, at *1 (S.D.N.Y. Mar. 5, 2003).

"Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct. It requires a lawyer to rely on legal education and experience to inform judgment." In re Cnty. of Erie, 473 F.3d at 419 (internal citation omitted). "Where there are several possible interpretations of a document based upon the surrounding circumstances, the party asserting the privilege must produce evidence sufficient to satisfy a court that legal, not business, advice is being sought." Urb. Box Off. Network, Inc. v. Interfase Managers, L.P., 2006 WL 1004472, at *6 (S.D.N.Y. Apr. 18, 2006).

Defendants contend that, for this category, "the documents challenged by [DeKalb] . . . all included, at the very least, an implied request for legal advice." Def. Opp. at 12 (punctuation omitted). We accept that there may be instances where there is an "implied" request for legal advice that would be protected under attorney-client privilege. Nonetheless, "[a]lthough a request for legal advice need not be explicit, because information is frequently sent to in-house corporate counsel in order to keep them apprised of ongoing business developments, the implied request for advice must still be the primary reason for the communication in order for the privilege to attach." In re Aenergy, S.A., 451 F. Supp. 3d at 324.

Defendants submit two declarations: one from their outside attorney, Jared Gerber, and a second from Taylor K. Reynolds, "Senior Counsel of Commercial Litigation at AbbVie Inc.,"

6

Reynolds Decl. ¶ 1.[4]  Reynolds explains that "[g]iven the highly-regulated nature of Allergan's business and the attendant legal risks, it is common practice for Allergan employees to include in-house counsel on communications with the expectation that they would provide legal advice as needed." Id. ¶ 5.  This general explanation is all the detail Reynolds provides for any of the e-mails.  In other words, Reynolds supplies no specific context for any of the documents submitted as a representative sample for this category.  This does not permit defendants to meet their burden of showing the documents are privileged.  The conclusory assertion that it is a "common practice" for attorneys to be included in communications in order to give legal advice as needed is hardly sufficient to establish that any of the withheld communication was sent for the purpose of seeking legal advice.  See In re Aenergy, S.A., 451 F. Supp. 3d at 323 (finding a declaration fell "short of showing that seeking legal advice was the predominant purpose of [the] email" where the declarant "asserted . . . that he deliberately copied [the attorney] in order to seek her legal advice," but did not claim to have "sent the email to obtain legal advice, only that he copied [the attorney] to that end") (punctuation and emphasis omitted).  This is especially true where the attorney is merely included in the "cc" or "bcc" line of an e-mail.

In any event, the Court has conducted an in camera review of the documents submitted by DeKalb as a representative sample.  We find no basis for concluding that the primary purpose of any of the sample documents was to seek legal advice.

To give but a few examples, AGN-00344855 is an e-mail chain discussing a potential response to a reporter's request for information regarding an FDA statement about breast implants causing cancer.  Defendants did not redact the reporter's initial e-mail or its forwarding

---

[4] "Allergan Limited," formerly Allergan plc, "is 100% indirectly owned by AbbVie Inc." Rule 7.1 Corporate Disclosure Statement, filed August 11, 2020 (Docket # 141).

to others in the company but did redact discussions amongst employees about responding to the request. In this e-mail chain, a single attorney, Bryan Smith, was copied along with six other individuals. See Privilege Redact Log at 39. Smith sent one brief e-mail to the group. Defendants' privilege log indicates that this document is a request for legal advice and that it provides legal advice. See id. But nothing the defendants have submitted, including the e-mails themselves, demonstrate that the primary purpose of the communication among the group was to obtain legal advice from Smith. Moreover, Smith's response gives nothing that even resembles legal advice. To the contrary, his response indicates merely that he would be ready to review a draft in the future.

AGN-00347945 is another e-mail chain. Most of this e-mail chain is redacted apart from the last reply. The original e-mail requests feedback on a proposed letter to an editor and has multiple recipients, only one of whom is an attorney, see Privilege Redact Log at 43. Defendants claim the privilege basis is a request for legal advice, see id., but the e-mails do not establish "that legal, not business, advice is being sought," Urb. Box Off. Network, Inc., 2006 WL 1004472, at *6. "Where non-legal personnel are asked to provide a response to a matter raised in a document, it cannot be said that the 'primary' purpose of the document is to seek legal advice." In re Buspirone Antitrust Litig., 211 F.R.D. 249, 253 (S.D.N.Y. 2002). Here, the e-mail chain requests that at least five people give their views on a topic, only one of whom is an attorney.

One e-mail chain, AGN-00474628, simply asks whether legal advice should be sought. A discussion amongst corporate employees about whether to seek legal advice in the future is not privileged. See generally Mejia, 655 F.3d at 132. Additionally, the primary purpose of this communication is clearly to craft a response to the upcoming news story about ALCL, not to seek or provide legal advice.

The remaining documents all follow a similar pattern.  In none of them is there a direct request to an attorney that makes clear that legal advice (as opposed to business advice) is being sought.  And even where an attorney is asked a question that could be legal in nature, it is not the primary purpose of the communication.  We also cannot discern an implicit request for legal advice when, as is true for these e-mails, an attorney is just one of numerous persons who are sent an e-mail asking for views as to a particular document or course of action.  Many of the e-mails are consistent with a group of corporate employees seeking to solve a corporate problem and keeping an in-house attorney apprised of the conversation or, at best, seeking the view of that in-house attorney that does not particularly seek legal advice.  As previously explained, "[w]here . . . non-legal personnel are asked to provide a response to a matter raised in a document, it cannot be said that the 'primary' purpose of the document is to seek legal advice." Medina v. Buther, 2018 WL 4383098, at *3 (S.D.N.Y. Aug. 22, 2018) (punctuation omitted).  Notably, in some e-mails (e.g. AGN-00541298), it is simply impossible to discern what is being sought from an attorney as it appears the corporate actors have made determinations that do not require any attorney input.  It would require only speculation to understand the attorney's involvement.  See generally Urb. Box Off. Network, Inc., 2006 WL 1004472, at *6 (party asserting the privilege has the burden to "produce evidence sufficient to satisfy a court that legal, not business, advice is being sought").

In sum, Allergan has not met its burden of showing the documents in category two are privileged and therefore the documents in this category shall be produced.

B. Category Four

Category Four involves 356 documents that DeKalb asserts are not privileged because the privilege was waived when they were shared with non-Allergan persons or entities. Pl. Mem. at 7-8, 17.

Generally, attorney-client privilege is waived when a privileged communication is disclosed to a third party. See In re Horowitz, 482 F.2d 72, 81 (2d Cir. 1973) ("subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed"), cert. denied, 414 U.S. 867 (1973). "The rationale for the waiver doctrine is that, as the Second Circuit has held, 'it is vital to a claim of privilege that the communications between client and attorney were made in confidence and have been maintained in confidence.'" Universal Standard Inc., 331 F.R.D. at 87 (quoting Mejia, 655 F.3d at 134).

"Notwithstanding this general rule, several lines of cases have developed in which courts have not found a waiver even where attorney-client communications were shared with a third party." Universal Standard Inc., 331 F.R.D. at 87. These exceptions include

> (1) cases in which the third party is deemed essential to allow communication between the attorney and the client, such as an interpreter or accountant, see, e.g., United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989); (2) cases involving communications between a third party and a corporation's attorney where the third party is deemed the "functional equivalent" of a corporate employee, see, e.g., In re Copper Market Antitrust Litigation, 200 F.R.D. 213, 216 (S.D.N.Y. 2001); and (3) cases involving "consultants used by lawyers to assist in performing [certain] tasks that go beyond advising a client as to the law" — in particular, tasks that "promote broader public interests in the observance of law and administration of justice," In re Grand Jury Subpoenas Dated March 24, 2003, 265 F. Supp. 2d 321, 329 (S.D.N.Y. 2003).

Id.

Although defendants argue the entries challenged in this category fall under one of the exceptions, they do not clearly identify which sample documents correspond with which exceptions.  See Def. Opp. at 15-19.  Based on their arguments, defendants seem to claim that attorney-client privilege was not waived for confidential information shared with public relations and communications firms, as well as Allergan's financial advisors, because these third parties aided Allergan in legal tasks, and that the remaining third parties were the functional equivalent of an Allergan employee.  See id.  We address each exception next.

1. Third Parties Used by Lawyers to Aid in Legal Tasks

The exception involving those who aid lawyers in legal tasks is best exemplified by the case of In re Grand Jury Subpoenas Dated Mar. 24, 2003, 265 F. Supp. 2d 321 (S.D.N.Y. 2003).  As we have previously explained, this case

> involved a high profile target of a criminal investigation.  See [In re Grand Jury Subpoenas Dated Mar. 24, 2003, 265 F. Supp. 2d] at 322-23.  The target's attorney determined that a public relations firm should be engaged to conduct a media campaign in an effort to paint the target in a favorable light so that the prosecutors might feel less pressure to indict.  Id. at 323-24.  The court found that the engagement of the public relation firm was necessary for the lawyers "to perform some of their most fundamental client functions — such as (a) advising the client of the legal risks of speaking publicly and of the likely legal impact of possible alternative expressions, (b) seeking to avoid or narrow charges brought against the client, and (c) zealously seeking acquittal or vindication."  Id. at 330.  In other words, the public relations function being performed — characterized as a "lawyer's public advocacy on behalf of the client," id. at 329 — was necessary to achieve a circumscribed litigation goal: specifically, influencing the decision whether or not to indict.  The court limited its holding to situations where a public relations consultant was "hired by the lawyers to assist them in dealing with the media in cases such as this," and where the communications "are made for the purpose of giving or receiving advice . . . directed at handling the client's legal problems."  Id. at 331.

Universal Standard Inc., 331 F.R.D. at 91–92 (some alteration in original).

The only factual basis for the application of this exception is contained in the statement of Reynolds, who indicates that "[f]rom 2015 through 2019, Allergan retained a number of

11

communications and public relations firms to assist in drafting responses to media and regulator inquiries, to prepare regulatory filings, to monitor media reports and inquiries in various countries, and to provide media training to Allergan representatives." Reynolds Decl. ¶ 8. Reynolds walks through the eleven communications and public relations firms hired by Allergan, explaining when and why they were hired. See id. ¶¶ 8-36.

But Reynolds's statement fails to establish that the exception applies to any of the withheld documents. Defendants claim to have "relied on public relation consultants for guidance in communicating with government and regulatory agencies and the media on issues involving BIA-ALCL — an issue which involved significant legal risk." Def. Opp. at 16. However, the fact that there was "legal risk" involved in certain corporate actions is irrelevant to the issue of privilege inasmuch as corporations routinely engage in tasks that involve "legal risk." "Rel[ying] on" outside entities to mitigate or manage that risk, id., does not mean that those actors are acting at the direction of attorneys to accomplish a legal task. The hiring of the public relations firm in In re Grand Jury Subpoenas Dated March 24, 2003 was not for the purpose of mitigating the "risk" that involved speaking publicly. Instead, "the critical element from In re Grand Jury Subpoenas Dated March 24, 2003" is that the attorneys were "using a public relations consultant to implement a specific legal strategy that required the use of a public relations consultant." Universal Standard Inc., 331 F.R.D. at 92 (collecting cases). No such claim is made here. The closest Allergan comes to such a claim is with respect to its use of a "regulatory communications firm" called "3D Communications" ("3D"), Reynolds Decl. ¶ 9. Allergan "retained 3D's services," in "preparation for its presentation at the February 2019 [French National Agency for Medicines and Health Products Safety] [Temporary Specialist Scientific Committee] meeting." Id. ¶ 11. 3D's services "included a review and evaluation of

12

Allergan's scientific data and regulatory materials; development of the presentation outline, slides and script; preparation for questions and answers from the regulator; and speaker and media training." Id.; see also Exh. A of Reynolds Decl. While Allergan might have been in legal peril had it presented facts in the wrong manner or had it been unpersuasive, there is no evidence Allergan's use of 3D was "to implement a specific legal strategy that required the use of a" regulatory communications firm. Universal Standard Inc., 331 F.R.D. at 92. Reynolds does not state what legal strategy Allergan allegedly used 3D to implement. There is also no evidence that the firm was hired by or operated under the direction of an attorney. As to the remaining communications and public relations firms, Reynolds gives a general explanation of what services each of the communications and public relations firms provided to Allergan, see Reynolds Decl. ¶¶ 13-36, but fails to point to any specific legal strategy which required their engagement.[5]

Defendants also argue that attorney-client privilege has not been waived for communications with Allergan's financial advisors because they fall under the same exception. See Def. Opp. at 17. Once again, there is no suggestion that these financial advisors were engaged by Allergan's attorneys to engage in any specific legal task. See Reynolds Decl. ¶¶ 40-42. Indeed, it appears the financial advisors were engaged to assist in routine corporate tasks (including "regulatory filings" and "management of capital and debt."). Id. ¶ 40. While the assertion is made that the financial advisors received "instructions" and "legal advice" from Allergan's in-house and outside counsel for unexplained purposes, id. ¶ 41, there is no evidence

---

[5] In a few scattered instances, Reynolds says that an attorney hired, supervised, or corresponded with a particular firm. See Reynolds Decl. ¶ 14, 24, 26, 28, 35-36. While such a relationship inches closer to meeting the waiver exception, it still falls far short of showing an attorney used the firm to implement a particular legal strategy.

that the financial advisors were implementing a legal strategy. The only case defendants cite to support their claim to non-waiver, see Def. Mem. at 17, found the party asserting attorney-client privilege had not waived this privilege for communications that included their financial advisors under a different exception — specifically the exception for a financial advisor whose role "is limited to helping a lawyer give effective advice by explaining financial concepts to the lawyer," Pearlstein v. BlackBerry Ltd., 2019 WL 2281280, at *2 (S.D.N.Y. May 29, 2019) (punctuation omitted) (quoting Urb. Box Off. Network, Inc., 2006 WL 1004472, at *3). There is no claim that these financial advisors were being used for this purpose.

      2. Functional Equivalent Doctrine

Defendants argue that Allergan's "communications with a number of affiliates . . . , distributors, and physicians on the company's Breast Implant Scientific Advisory Board, among other consultants," did not waive attorney-client privilege because they "undertook responsibilities on various tasks on behalf of Allergan . . . that often required receiving instructions and legal advice directly from Allergan's in-house counsel." Def. Sealed Opp. at 17. While not explicitly stated by defendants, defendants cite to the leading case in this district on the functional equivalent exception, In re Copper Mkt. Antitrust Litigation, 200 F.R.D. 213 (S.D.N.Y. 2001), see Def. Opp. at 18, and we therefore assume that they rely on this exception.

Under the functional equivalent exception, "communications between a company's lawyers and its independent contractor merit protection if, by virtue of assuming the functions and duties of full-time [sic] employee, the contractor is a de facto employee of the company." Exp.-Imp. Bank of the U.S. v. Asia Pulp & Paper Co., Ltd., 232 F.R.D. 103, 113 (S.D.N.Y. 2005).

> Courts in this Circuit have considered the following factors, among others, to determine functional equivalency: whether the consultant exercised independent

> decision-making on the company's behalf; possessed information held by no one else at the company; served as a company representative to third parties; maintained an office at the company or otherwise spent a substantial amount of time working for it; and sought legal advice from corporate counsel to guide his or her work for the company.

In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig., 352 F. Supp. 3d 207, 213 (E.D.N.Y. 2019) (collecting cases).

Reynolds's declaration is the only evidence submitted by defendants to establish these third parties were de facto employees of Allergan. Reynolds states that "Allergan . . . engaged a number of affiliates and distributors to manage the distribution and promotion of its products in various local markets." Reynolds Decl. ¶ 37. The "distributors and affiliates often received instructions and legal advice directly from Allergan's in-house counsel," id. ¶ 39, and Allergan has "maintained close long-term relationships with each of the[] distributors," id. ¶ 38. As to Allergan's consultants, "Allergan . . . engaged a number of medical and scientific advisors to provide extensive support on matters relating to Allergan's portfolio of healthcare products." Id. ¶ 43. The advisors were "retained . . . for assistance on numerous matters, including for support on presentations Allergan made to various advisory boards and organizations as well as relating to global meetings Allergan planned and ran that allowed experts worldwide to collaborate on issues such as BIA-ALCL." Id. ¶ 44. One member of Allergan's in-house counsel is identified as having been "involved in such communications" (presumably referring to communications about the "numerous matters.") Id. Reynolds adds that, "[g]iven the close relationship between Allergan and these medical and scientific advisors, as well as the sensitivity of the projects for which the scientific advisors were involved, Allergan expected that legal advice conveyed to them would be kept confidential, and acted accordingly to preserve confidentiality." Id. ¶ 45.

These general pronouncements fail to establish that all or even some of the third parties at issue were the functional equivalent of an Allergan employee. Providing "extensive support" and "assistance" to Allergan hardly shows that the companies or advisors operated as the functional equivalent of an Allergan employee. There is no evidence that each of these companies and advisors operated as independent decision makers, served as Allergan's representatives to third parties, or maintained offices at Allergan. The claim that in-house counsel for Allergan was involved in communications with its medical and scientific advisors, see Reynolds Decl. ¶ 44, and that the "distributors and affiliates often received instructions and legal advice directly from Allergan's in-house counsel," id. ¶ 39, is not enough to deem these companies functional equivalents of an Allergan employee. Nor is it of any importance that Allergan used the expertise of third parties to "manag[e] its legal risks." Id. ¶ 7; Def. Opp. at 18. As noted, corporations commonly engage in conduct that involves legal risks. A corporation's discussion of such matters with a consultant does not result in the consultant being magically converted into the functional equivalent of an employee of the corporation.

Reynolds does claim that the "affiliates and distributors . . . manage[d] the distribution and promotion of [Allergan's] products in various local markets." Reynolds Decl. ¶ 37. But "[b]usinesses routinely rely on other companies to carry out important functions and services . . . . If this relationship satisfied the functional equivalent standard, the exception could well swallow the rule." Homeward Residential, Inc. v. Sand Canyon Corp., 2017 WL 4676806, at *14 (S.D.N.Y. Oct. 17, 2017). The only case relied on by defendants, In re Copper Mkt. Antitrust Litig., does not support their argument. There, the third party "crisis management public relations firm," worked "largely out of [the corporation's] headquarters" and "acted as [the corporation's] agent and its spokesperson when dealing with the Western press." In re

16

Copper Mkt. Antitrust Litig., 200 F.R.D. at 215 (punctuation omitted).  The court found that the consultant "was the functional equivalent of an in-house public relations department with respect to Western media relations, having authority to make decisions and statements on [the corporation's] behalf."  Id. at 216.  Here, defendants have failed to establish that any of the third party distributors, affiliates or scientific and medical advisors were "so fully integrated into the [Allergan] hierarchy as to be a de facto employee," Exp.-Imp. Bank of the U.S., 232 F.R.D. at 114.  We therefore find defendants waived attorney-client privilege for communications with third party distributors, affiliates, and medical and scientific advisors.  These communications must therefore be produced.

    C.  Category Five

Category Five consist of 18 documents that DeKalb alleges were "widely disseminated among Allergan employees who did not 'need to know' or need to be included in order to effectuate the allegedly provided legal advice."  Pl. Mem. at 21.  DeKalb argues that, by widely disseminating these communications to numerous employees, defendants waived attorney-client privilege.  See id. at 21-22.

As previously explained,  normally "the attorney-client privilege is automatically waived when a privileged communication is disclosed to a third party or litigation adversary."  Scott, 94 F. Supp. 3d at 598.  However, "[t]he general rules governing waiver are more complicated when the issue arises in the context of corporate entities."  In re Grand Jury Proc., 219 F.3d 175, 183 (2d Cir. 2000).  "[T]he distribution within a corporation of legal advice received from its counsel does not, by itself, vitiate the privilege."  Scott, 94 F. Supp. 3d at 598.  Instead, where privileged communications are shared with corporate employees, the question becomes whether the communications were shared with "employees of the corporation who are not in a position to act

17

or rely on the legal advice contained in the communication." Id.; see also Norton v. Town of Islip, 2015 WL 5542543, at *3 (E.D.N.Y. Sept. 18, 2015) ("Whether the privilege is waived depends on whether the recipient had a need to know the content of the privileged communication in order to perform her job effectively or to make informed decisions concerning, or affected by, the subject matter of the privileged communication.") (punctuation omitted).

    Here, defendants argue that the documents were distributed to persons with a need to know the information. Def. Opp. at 19-20. But actual evidence to support this assertion is lacking. Reynolds asserts only that "given the number of stakeholders with an interest in the issues facing Allegan's business and operations, it is common that a large number of Allergan employees are included on emails when necessary." Reynolds Decl. ¶ 6. But Reynolds fails to identify any of the often dozens of individuals who received the e-mails at issue, explain what their roles were, or explain why they needed to know the privileged information. Defendants' privilege logs do not provide any further clarity as the logs list only the employee names and do not provide any information on the non-attorney employee roles. See, e.g., Privilege Redact Log at 11; Privilege Withhold Log at 2. This scant evidence is not sufficient to allow the Court to find the employees included on these e-mails were "in a position to act or rely on the legal advice contained in the communication," Scott, 94 F. Supp. 3d at 598. Defendants have therefore failed to establish they did not waive attorney-client privilege when communications with privileged information were disseminated to these employees. See id. at 599-600 (discussing the titles and/or roles of each employee included on the e-mails at issue and assuming "all recipients were able to act upon or implement the [privileged] information" based on their titles). Accordingly,

defendants have failed to prove that they did not waive attorney-client privilege and must produce the documents in this category.

\* \* \*

In sum, defendants shall produce all documents and information DeKalb has challenged in categories two, four and five.

## IV.  CONCLUSION

For the foregoing reasons, DeKalb's motion to compel defendants to produce certain documents and information withheld based on claims of attorney-client privilege (Docket # 239), is granted in part.

SO ORDERED.

Dated: September 9, 2021
New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

19